# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| GENE WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:15-CV-277-TLS |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case was transferred to the undersigned for all further proceedings under General

Order 2017-4 [ECF No. 26] effective May 1, 2017. The Plaintiff, Gene Williams, on behalf of

Pamela Townsend, now deceased, seeks review of the final decision of the Commissioner of the

Social Security Administration denying her application for Disability Insurance Benefits (DIB)

and Supplemental Security Income (SSI). Mr. Williams claims that Ms. Townsend was unable to

maintain substantial gainful employment due to limitations brought about by various physical

and psychological impairments. The Court finds that the Administrative Law Judge (ALJ) did

not fulfill her affirmative obligation to inquire whether there was a conflict between the

Vocational Expert's (VE) testimony and the Dictionary of Occupational Titles (DOT), and

remands this matter back to the ALJ.

## PROCEDURAL HISTORY[1]

This case has an extensive procedural history going back over fifteen years. Most relevant here are the events that occurred after Ms. Townsend passed away in October 2011. Prior to her passing, this matter was before the ALJ after the Court remanded the decision back to the Commissioner in 2007.[2] In November 2011, Ms. Townsend's father filed a notice to substitute himself as a party (R. 263, 382).

---

[1] The Defendant filed an Administrative Record on May 6, 2016. [ECF No. 9.] When the Plaintiff informed the Defendant that the Administrative Record was incomplete, the Defendant began to compile an amended administrative record. On August 15, 2016, before the Commissioner filed an amended administrative record, the Plaintiff filed her brief along with an appendix because the Plaintiff "believe[d] that he had a complete copy of the missing portion of the Administrative Record." [Pl.'s Br. 6 n.1, ECF No. 16.] The Plaintiff's brief has citations to both the Defendant's first Administrative Record and her appendix. *Id.* On September 15, 2016, the Defendant filed an Amended Administrative Record. [ECF No. 17.] For the purposes of this Opinion and Order, the Court will refer to the numbers stamped in the upper right-hand corner of the Amended Administrative Record.

[2] The Court summarizes this case's procedural history prior to Ms. Townsend's death below. In February 2002, Ms. Townsend, the original Plaintiff who is now deceased, filed a claim for DIB, which was denied initially and on reconsideration by the state agency. (R. 14, 1144.) The ALJ issued a written decision in February 2005, in which he concluded that Ms. Townsend was not disabled because she retained the residual functional capacity (RFC) to perform a reduced range of light work, as well as other jobs that existed in significant numbers in the national economy. (R. 14–20.) In April 2005, Ms. Townsend sought review of the ALJ's decision by the Appeals Council (R. 6.) In June 2005, the Appeals Council denied review of ALJ McGrath's February 2005 decision. (R. 3–5.) Ms. Townsend appealed the Appeals Council's denial of review and filed a complaint in this Court. In May 2007, the Court remanded the case back to the Commissioner, *Townsend v. Social Security Commissioner*, No. 05-CV-277-TLS-RBC (N.D. Ind. Nov. 8, 2007), and in June 2007, the Appeals Council remanded the case back to ALJ McGrath. (R. 298, 337–38.) While Ms. Townsend's case was pending with the Appeals Council, she filed another claim for DIB and a claim for SSI in May 2005. (R. 1206.) The state agency denied Ms. Townsend's May 2005 DIB and SSI claims initially in October 2005 and on reconsideration in December 2005. In February 2006, Ms. Townsend asked for a hearing in front of an ALJ. (R. 339, 343–46, 1206.) In its June 2007 remand order, the Appeals Council consolidated Ms. Townsend's initial February 2002 DIB claim with her May 2005 DIB claim and SSI claims. (R. 335–38.) The Appeals Council instructed ALJ McGrath to offer Ms. Townsend a new hearing, take any further action needed to complete the administrative record, and issue a new decision on all three of Ms. Townsend's claims. (*Id.*) The ALJ issued a written decision in July 2008, in which he concluded that Ms. Townsend was not disabled because she retained the RFC to perform a reduced range of light work, as well as other jobs that existed in significant numbers in the national economy. (R. 307–14.) In August 2008, Ms. Townsend sought review of the ALJ's decision by the Appeals Council. (R. 303.) While the matter was pending with the Appeals Council, Ms. Townsend filed another SSI claim in August 2009. (R. 295.) That claim was allowed at the initial level and found that Ms. Townsend was disabled as of August 11, 2009. (*Id.*) In July 2010, the Appeals Council remanded ALJ McGrath's July 2008 decision to a different ALJ because ALJ McGrath did not follow the Court's May 2007 remand order to address Ms. Townsend's panic attacks or her father's testimony. (R. 295–99.) The Appeals Council instructed the ALJ to comply with the Court's

In January 2012, after a hearing in May 2011 in which neither Ms. Townsend nor her father testified, the ALJ issued a written decision, concluding that Ms. Townsend was not disabled at any time before November 1, 2008, but became disabled on that date and continued to be disabled through the date of her death. (R. 252–62); *see* 20 C.F.R. § 404.503(b). The ALJ explained that before November 1, 2008, Ms. Townsend retained the residual functional capacity (RFC) to perform a reduced range of light work as well as her past relevant work as a store manager, cashier, and quality inspector. (R. 252–59.) The ALJ found that beginning November 1, 2008, Ms. Townsend retained the RFC to perform a reduced range of sedentary work, but was unable to perform her past relevant work, and there were no jobs that existed in significant numbers in the national economy that she was able to perform. (*Id.*)

In May 2012, Mr. Williams appealed ALJ Stam's decision to the Court. (R. 1222.) In September 2013, the Court affirmed ALJ Stam's partially favorable decision and entered judgment in favor of the Commissioner. *Williams v. Commissioner of Social Security*, No. 12-cv-153-JEM (N.D. Ind. Sept. 23, 2013). In November 2013, Mr. Williams filed a notice of appeal, and in September 2014, the Seventh Circuit reversed and remanded the case back to the Commissioner. *Williams v. Colvin*, 757 F.3d 610, 615 (7th Cir. 2014). In its Opinion, the Seventh Circuit found that the ALJ committed a multitude of errors, including finding that Ms. Townsend's only medically determinable impairment was fibromyalgia; not considering the combined effects of all of her impairments; amplifying minimal limitations; and not asking questions of Ms. Townsend and her father. *Id.* at 613–15. "The errors . . . identified, taken together, require[d] reversal of the district court's decision and a remand to the Social Security

_____

May 2007 order, further evaluate the Plaintiff's mental impairments using the special technique described in 20 C.F.R. §§ 404.1520a, 416.920a, give further consideration to the Plaintiff's maximum RFC, and if warranted by the expanded record, obtain VE testimony. (*Id.*)

Administration for a redetermination of the date on which [the Plaintiff] became totally disabled and thus eligible for disability insurance benefits." *Id.* "If that date was earlier than June 30, 2006 (the date of 'last insured,' which means the date on which she ceased to be covered by social security disability insurance), her father is entitled to his daughter's disability insurance benefits from that date until the date of her death." *Id.*

The Appeals Council then remanded the case back to ALJ Stam, instructing her to follow the Seventh Circuit's opinion and order, and to only consider the period before November 1, 2008.[3] (R. 1219–20.)

In March 2015, the Plaintiff's father, who was represented by an attorney, appeared and testified at a hearing before ALJ Stam, as did the VE and a medical expert. (R. 227–46.) ALJ Stam issued a written decision in June 2015 in which she concluded that from May 1, 2002, the Plaintiff's initial onset date, through October 31, 2008, the date before she was previously found to be disabled, the Plaintiff was not disabled because she retained the RFC to perform a reduced range of sedentary work, as well as other jobs that existed in significant numbers in the national economy. (R. 1144–62.)

---

[3] The Appeals Council wrote in relevant part:

> The court directed consideration of the claimant's combined impairments, both severe and non-severe as required by 20 C.F.R. § 404.1523 and § 416.923. The court also directed a redetermination of the onset date. Here, the Administrative Law Judge's decision dated January 19, 2012, *established an onset date* of November 1, 2008, at age 50, under Rule 201.14. Neither the Court of Appeals, nor the Appeals Council disturbs that onset date. Therefore, further consideration as ordered by the court is limited to the period (PAI) prior to November 1, 2008.

(R. 1220 (emphasis added).)

The Plaintiff filed the Complaint [ECF No. 1] on September 28, 2015, appealing this decision. The Court must now decide whether to affirm ALJ Stam's decision that the Plaintiff was not disabled from May 1, 2002, through October 31, 2008.

## THE ALJ's HOLDING[4]

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but alsoany other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. § 423(d)(2)(A).

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits. 20 C.F.R. § 404.1520. The first step is to determine whether the claimant no longer engages in substantial gainful activity (SGA). *Id.* In the case at hand, the Plaintiff met the insured status requirements of the Social Security Act only through June 30, 2006. (R. 1147.)

In step two, the ALJ determines whether the claimant has a severe impairment limiting the ability to do basic work activities under § 404.1520(c). Here, the ALJ determined that the Plaintiff had severe impairments during the period of May 1, 2002, through October 31, 2008, the alleged onset date, including post-traumatic stress disorder, a history of substance abuse, chronic headaches, fibromyalgia, and chronic obstructive pulmonary disease. (*Id.*); 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ found that these impairments caused more than minimal

---

[4] For the remainder of this Opinion and Order, the "Plaintiff" will refer to Ms. Townsend and her father.

limits in the Plaintiff's ability to perform the basic mental and physical demands of work and had each lasted at least 12 months, the duration requirement for severe impairments.

Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of [the] listings in appendix 1 . . . ." §§ 404.1520(a)(4)(iii). If a claimant's impairment(s), considered singly or in combination with other impairments, rises to this level, he earns a presumption of disability "without considering [his] age, education, and work experience." § 404.1520(d). But, if the impairment(s), either singly or in combination, falls short, an ALJ must move to step four and examine the claimant's "residual functional capacity" (RFC)—the types of things he can still do physically, despite his limitations—to determine whether he can perform this "past relevant work," § 404.1520(a)(4)(iv), or whether the claimant can "make an adjustment to other work" given the claimant's "age, education, and work experience." § 404.1520(a)(4)(v).

In the case at hand, the ALJ determined that the Plaintiff's impairments did not meet or equal any of the listings in Appendix 1 and that she had the RFC to perform light work, as defined by § 404.1567(b). (R. 1147.) Specifically, the ALJ held that the Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.957(a), lifting no more than ten pounds, except that the Plaintiff could not climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; she required the use of a cane to walk; and she had to avoid concentrated exposure to pulmonary irritants such as fumes, dust, gases, and poorly ventilated areas. Mentally, the Plaintiff could not work around the public, but could tolerate brief and superficial interaction with coworkers and supervisors; she could perform simple routine tasks in a relatively

unchanging setting or process, with no more than concrete judgment and no fast pace work required. (R. 1147.)

The ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (R. 1154.) But the ALJ found that the Plaintiff's past statements and her father's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (*Id.*)

The ALJ analyzed the record and determined that the Plaintiff was not disabled. The ALJ found that the Plaintiff's impairments, either singly or in combination, did not meet or medically equal the severity of a listed section. The ALJ then assessed the Plaintiff's RFC by evaluating the objective medical evidence, the medical source opinion evidence, and the Plaintiff's subjective symptoms. The ALJ noted that at the prior hearings, the Plaintiff testified that she had leg tremors and fell frequently. (*Id.*) The Plaintiff also said that she needed to use a cane to walk because of these tremors and arthritis pain in her knees. (*Id.*) The Plaintiff also testified that she had chronic headaches and severe pain all over her body from fibromyalgia. (*Id.*) The Plaintiff took Neurontin, Duragesic, and Darvocet N100 for pain at first, and then was administered methadone for several years. (*Id.*) The Plaintiff reported a reduction in pain with methadone. (*Id.*) The ALJ noted that both medical experts at the hearings testified that a diagnosis of fibromyalgia was supported in the medical records. (*Id.*) The ALJ took into consideration the effects of fibromyalgia, both physically and mentally, determining the Plaintiff's RFC.

The ALJ also took into account the Plaintiff's significant history of abusing crack cocaine, and noted that it was not entirely clear how many of her symptoms were caused by residuals from that abuse. (*Id.* at 1155.) The ALJ noted that the Plaintiff used a cane to ambulate throughout the relevant period because her gait was antalgic. (*Id.*) The ALJ noted that the

Plaintiff consistently complained of sleep problems that might have caused some fatigue and loss of energy during the day, whether the sleep problems were caused by physical pain, obstructive sleep apnea, PTSD, or night terrors. (*Id.*) The ALJ stated that these were all reasons why the Plaintiff could not sustain more than sedentary exertion after the alleged onset date. (*Id.*)

The ALJ noted that it was not clear that any physician prescribed the use of a cane before 2009, but all the records reflected that the Plaintiff did, in fact, use one cane to walk when she left her home. (*Id.*) The ALJ included this in the Plaintiff's RFC as well. (*Id.*) The ALJ stated that the need to use a cane, along with the Plaintiff's reports of limited stamina, limited her to the sedentary level of exertion because she could not stand or walk in combination more than two hours out of an eight-hour workday. (*Id.*) And she could not lift or carry more than ten pounds during this period. (*Id.*)

The ALJ decided that the record did not support greater limitations in mental or physical functioning than stated in the RFC. (*Id.* at 1159.) The ALJ noted that though it was clear that the Plaintiff had limited daily activities based upon the Plaintiff's testimony and Mr. William's testimony, it was not clear that this was due to her medical issues rather than a habit or personal choice. (*Id.*) The ALJ observed that Mr. Williams admitted at the last hearing that his recollection and memory of the relevant period had become somewhat vague due to the passage in time. (*Id.*) The ALJ concluded that the credibility of Mr. Williams's testimony was reduced because more than ten years had elapsed since the alleged onset date. (*Id.*) The ALJ also concluded that he could not infer from the Plaintiff's death from lung embolism that her COPD was causing more limits than the RFC provided for. (*Id.*) The ALJ stated that this was because there were too many intervening years between 2008 and 2011, the year of the Plaintiff's death. (*Id.*)

The ALJ noted that Dr. Panszi indicated in 2009 that there had been a significant deterioration in the Plaintiff's health since he first treated her in 2002. (*Id.*) And by 2009, he did not think she could still work. (*Id.*) The ALJ noted that Dr. Panszi's opinion was the basis for the prior decision that the Plaintiff could not perform more than sedentary exertion at the time she attained age 50, when she then was found to be disabled under the medical-vocational grid rules as of November 1, 2008. (*Id.*)

The ALJ, taking into account the combined effects of the Plaintiff's mental and physical conditions, both severe and nonsevere, concluded that the Plaintiff could not have performed more than a limited range of sedentary exertion since May 1, 2002, the alleged onset date, and did have some mental restrictions during the relevant period. On the other hand, the ALJ noted that both of the medical experts at the last two hearings did not think that the Plaintiff's physical impairments during the relevant period would have precluded the performance of sedentary work, and the reviewing State agency physicians also concluded that the Plaintiff remained capable of performing some work, first at the medium level of exertion in June 2003, and then at the light level of exertion in December 2003. (*Id.*) The ALJ noted that the State Agency found that the Plaintiff could perform medium exertion again in August 2005. (*Id.*) But by January 2010, the reviewing physicians noted that the Plaintiff could perform no more than sedentary exertion. (*Id.*)

The ALJ noted that the Plaintiff had enough pain and problems with ambulation in spite of treatment to limit her to no more than the sedentary level of exertion throughout the relevant period. (*Id.*) As a result, the ALJ gave limited weight to the opinions of the State Agency physicians. (*Id.*) On the other hand, the State Agency finding that the Plaintiff remained capable of performing some kinds of work in spite of her impairments was given some weight. (*Id.*) The

ALJ found that the sedentary level of exertion was more appropriate than the light level of exertion when the Plaintiff's combination of mental and physical impairments was looked at because there was some fatigue present that could have been due to mental impairments and poor sleep from PTSD as well as due to pain. (*Id.*) In addition, the use of a cane while standing and walking is a barrier to light work. (*Id.*)

After giving the reasons for the Plaintiff's RFC, the ALJ next determined that based upon the vocational expert's testimony, the Plaintiff was unable to perform past relevant work during the period from May 2002, through October 31, 2008. (*Id.* at 1160.) Lastly, the ALJ determined that given the Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed during that period. (*Id.*) The ALJ noted that the vocational expert testified that the Plaintiff could perform the jobs of addresser (DOT 209.587-010, SVP 2, approximately 200 jobs in Indiana and 34,000 jobs nationally), surveillance system monitor (DOT 379.3670-010, SVP 2, 200 jobs in Indiana and 15,500 jobs nationally), and document preparer (DOT 249.587-019, SVP 2, 16,000 jobs in Indiana and 790,00 jobs nationally). (*Id.*)

**STANDARD OF REVIEW**

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A court will affirm the Commissioner's findings of fact and denial of disability benefits if substantial evidence supports them. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Richardson*, 402 U.S. at 399–400. In a substantial-evidence determination, the Court considers the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute the court's judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In other words, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

When an ALJ recommends that the Agency deny benefits, the ALJ must first "provide a logical bridge between the evidence and [her] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citation omitted). Though the ALJ is not required to address every piece of evidence or testimony presented, "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008). Conclusions of law are not entitled to such deference, however, so where the ALJ commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

**DISCUSSION**

I.      **Substantial Basis in Evidence**

        The burden is on the claimant to show how her impairments met or medically equaled a

listed section. 20 C.F.R. §404.1512; *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (finding

that the claimant bears the burden of establishing that she met all of the requirements of a listed

section) (citations omitted). To meet this burden, the claimant must show, with objective medical

evidence, that her impairments met all of the criteria specified in a listed section. 20 C.F.R.

§§ 404.1525, 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384

F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in

order to receive an award of" benefits at step three). "An impairment that manifests on some of

[the required] criteria, no matter how severe, does not qualify." *Zebley*, 493 U.S. at 530. The

regulations, at 20 C.F.R. § 404.1525(c)(4), require that the findings meet or medically equal the

listing criteria for at least twelve continuous months, which is consistent with the Social Security

Act's requirement that an impairment last at least twelve months. 42 U.S.C. §§ 423(d)(1)(A),

(2)(A).

        When determining the severity of mental impairments, under the regulations, the ALJ

rates the degree of functional limitation in four broad functional areas: (1) activities of daily

living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation. 20 C.F.R. §§ 404.1520a(c)(3), (4). These ratings are used at both step two

(severity) and step three (listings). 20 C.F.R. § 404.1520a. An ALJ rates the degree of limitation

in the first three functional areas as none, mild, moderate, marked, or extreme, and rates the

degree of limitation in the fourth functional area using a four point scale (none, one or two, three,

four or more). *Id.* If an ALJ rates a claimant's degree of limitation in the first three functional

areas as "none" or "mild," and "none" in the fourth functional area, the Agency concludes that claimant's mental impairments are not severe. 20 C.F.R. § 404.1520a(d)(1).

The mental health listings at issue here require that a claimant satisfy the requirements in both paragraphs "A" and "B" of the listing or those in paragraph "C" of the listing. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06. Paragraph B requires that the condition results in "at least two of the following": marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06 pt. B. "Marked" means "more than moderate but less than extreme," and "the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id*. at § 12.00, pt. C.

Paragraph C in listed section 12.04 requires a medically documented history of a chronic affective disorder of at least 2 years' duration that caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicated to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04, pt. C. Paragraph C in listed section 12.06 requires a condition resulting in complete inability to function independently outside the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.06, pt. C.

The Plaintiff first argues that the ALJ erred in its analysis of the "B" criteria listing of 12.04, 12.05, and 12.09, and next argues that the ALJ erred in adopting too narrow a view of "decompensation" in the "C" criteria. (Pl.'s Br. 16–18, ECF No. 16.) The Defendant argues that the ALJ reasonably found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed section. The Defendant argues that the ALJ specifically evaluated the Plaintiff's mental impairments and correctly concluded that they did not meet or equal the severity of listed sections 12.04 or 12.06 found in 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

The ALJ addressed the Plaintiff's fibromyalgia, headaches, chronic obstructive pulmonary disease (COPD), musculoskeletal complaints, posttraumatic stress disorder (PTSD), and a history of substance abuse, along with the combination of the Plaintiff's pain, panic attacks, nightmares, night terrors, and sleep waking at step three. (R. 1147–54.) The ALJ based her finding that none of the Plaintiff's impairments, either singly or in combination, met or medically equaled the severity of a listed section not only on the objective medical evidence, but also on the opinion of a medical expert from the May 2011 hearing and the medical expert from the March 2015 hearing. (R. 1149.) The ALJ explained that both experts opined that none of the Plaintiff's impairments, either singly or in combination, met or medically equaled the severity of a listed section at the time they rendered their opinions, and both experts are considered familiar with Agency regulations and definitions. (*Id.*); *see* 20 C.F.R. § 404.1526(e) (opinions from medical or psychological consultants designated by the Commissioner are used to determine medical equivalence); *Filus*, 694 F.3d at 867 ("Because no other physicians contradicted these two [state-agency reviewing-physician] opinions [on equivalency], the ALJ did not err in accepting them.").

The Plaintiff does not take issue with the ALJ's analysis of the listed sections concerning her physical impairments, but only argues that the ALJ improperly analyzed listed sections 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders). (Pl.'s Br. 15–18.) The Court addresses each argument in turn.

## A.    Activities of Daily Living

The Plaintiff contends that her mental impairments caused a marked restriction in her ability to carry out activities of daily living. (Pl.'s Br. 15–16.) The Plaintiff also argues that the ALJ "cherry-picked" evidence, mismatched time periods, and overemphasized her activities of daily living.

In determining that the Plaintiff had no limitation on her activities of daily living, the ALJ considered the Plaintiff's father's testimony about the Plaintiff's ability to carry out activities of daily living, and acknowledged his testimony that the Plaintiff had anxiety and mood swings about once per month in 2003, but they were not uncontrollable. (R. 1150.) The ALJ also considered the Plaintiff's father's testimony that before November 1, 2008, the Plaintiff's activities were very limited. The Plaintiff had trouble cooking, but this was because of her pain, fatigue, and weakness, not her mental impairments. (*Id.*) The ALJ discussed that the Plaintiff was in full remission from cocaine abuse since September 2002, read and watched television, did some laundry and housecleaning, cared for her dogs, and could eat, bathe, and dress independently. (*Id.*)

The Plaintiff's argument that the ALJ erred by discounting her father's testimony about her activities of daily living is unpersuasive. (Pl.'s Br. 16.) The ALJ gave little weight to the Plaintiff's father's testimony about the Plaintiff's activities of daily living as he was no longer a disinterested third party, now substituted for the Plaintiff, and admitted that his recollections of

the period before November 1, 2008, were vague. (R. 1150.) The ALJ considered a number of factors when determining that the Plaintiff had no restrictions on her activities of daily living, including the Plaintiff's and her father's testimony. (*Id.*)

Contrary to the Plaintiff's assertion, the ALJ did not solely discount the Plaintiff's father's testimony because he was not a medical observer, had trouble remembering, or was no longer a disinterested third party. (*Id.*) Rather, the ALJ considered all three reasons for not giving the Plaintiff's father's statements great weight, including his admission that his memories of the relevant period were vague. (*Id.*) Furthermore, the Plaintiff does not support these arguments with any citations to the record. The Plaintiff does not explain to what evidence the ALJ gave too much evidentiary value to and to what evidence the ALJ ignored. Nor does the Plaintiff elaborate on how the ALJ "mismatched time periods, or what evidence the ALJ should have considered or should not have considered." (*Id.*) "The claimant bears the burden of producing medical evidence that supports her claims of disability." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). "Perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) (quoting *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)).

Accordingly, the Plaintiff has not put forth any evidence that her activities of daily living were markedly limited, or evidence that her impairments met or medically equaled the severity of listed sections 12.04 or 12.06.

**B.**     **Social Functioning**

The ALJ found that the Plaintiff had moderate difficulty maintaining social functioning. The Plaintiff argues that her mental impairments caused a marked impairment in her ability to maintain social functioning. (Pl.'s Br. 16.) The Plaintiff particularly takes issue with the ALJ's

discussion of her attendance at religious services as evidence that her social functioning was not as impaired as alleged. (*Id.*)

As an initial matter, the Plaintiff's regular attendance at church was just one factor the ALJ considered when discussing the Plaintiff's ability to maintain social functioning. (R. 1150–52.) The ALJ, in addition to mentioning the Plaintiff's attendance at church, discussed objective medical findings, the Plaintiff's interactions with others, her ability to participate in group therapy, and her improvement with medication. (*Id.*) In finding that the Plaintiff had moderate difficulty maintaining social functioning, the ALJ acknowledged that the Plaintiff rarely left her house, sometimes became anxious around others and that her PTSD symptoms—including nightmares and flashbacks—increased after being raped. (R. 1151.) The ALJ considered the Plaintiff's issues with her son, her anxiety, restlessness, pressured speech during an examination, and the fact that she received Global Assessment Functioning rates of 45.[5] (*Id.*) The ALJ also discussed the Plaintiff's non-cooperative behavior at a 2005 consultative examination and the general waxing and waning of the Plaintiff's symptoms and stress. (*Id.*) The ALJ contrasted this evidence by discussing the Plaintiff's ability to go to church regularly, leave home to go to medical appointments, go shopping with her mother, and the fact that the Plaintiff had few friends. (R. 1150–51.) The ALJ also considered the Plaintiff's appropriate grooming at a consultative examination, her improvement with her medication, improved sleep, and appropriate mood and affect by 2005. (*Id.*) The ALJ also considered the Plaintiff's GAF rating of

---

[5] The GAF scale reflects a "clinician's judgment" of the individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders,* 32-34 (4th ed., Text Rev. 2000) (*hereinafter* "DSM-IV-TR"). An overall GAF score is dependent on separate assessments of (1) symptom severity, and (2) social, occupational, and school functioning. *Id.* A GAF rating of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). *Id.*

65[6] in August 2005, as well as the Plaintiff's ability to participate in group therapy in 2007. (R. 1151–52.)

The ALJ did not overemphasize or give too much weight to the Plaintiff's regular attendance at church. The ALJ did not state that attending religious services was a reason the Plaintiff was not disabled, or find that her attendance at church meant she had no impairment in social functioning. The Plaintiff's reasoning misunderstands the ALJ's ruling. Despite the Plaintiff's attendance at church, the ALJ found that she had moderate impairments in social functioning and put restrictions on her interactions with the public, coworkers, and supervisors to accommodate these impairments. (R. 1150–52, 1154.) The Plaintiff's arguments that the ALJ put an "unconstitutional restraint on the free exercise of religion" is not supported by a plain read of the ALJ's opinion. (Pl.'s Br. 16.)

The Plaintiff also contends that she could not socially function on a sustained basis because of years of mental health treatment and her need for her parents to care for her. (Pl.'s Br. 17.) But the Plaintiff does not provide any evidence that she was entirely unable to interact with others.

Accordingly, upon review of the record, the Court finds that the ALJ appropriately evaluated the Plaintiff's social functioning.

## C.      Episodes of Decompensation

The Plaintiff argues that because her parents took care of her—including caring for her at night, and taking her to and from appointments—she received the same type of care she would

---

[6] A GAF of 61–70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning well, has some meaningful interpersonal relationships. DSM-IV-TR at 32-34.

have received in an institutionalized setting, which would be indicative of a "multi-year decompensation." (Pl.'s Br. 17–18.) Episodes of decompensation, as defined by the regulations are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C)(4). The regulations note that a significant alternation in medication, or the need for a more structured environment such as a hospital or halfway house, would signify an episode of decompensation. *Id.* Importantly, to meet or medically equal listed sections 12.04 or 12.06, a claimant not only has to show that she experienced an episode of decompensation, but also that it was a repeated episode of decompensation of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06. The regulations define repeated episodes of decompensation, each of extended duration to mean three episodes within one year, or an average of once every four months, each lasting for at least two weeks. 20 C.F.R. Pt. 404, Supt. P, App'x 1, § 12.00(C)(4). Episodes of decompensation could medically equal a listed section even if they did not meet the exact durational and functional requirements of the listed section. *Id.*

Here, the Plaintiff argues that the ALJ erred because she did not interpret episodes of decompensation broadly enough. (Pl.'s Br. 17–18.) The Plaintiff argues that the care she received from her parents mimicked the care one would receive in an institutionalized setting, and cites to *Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010) to support her argument. (*Id.*) In *Larson*, the court found that the ALJ erred by not accepting a treating source physician's opinion that the claimant experienced repeated episodes of decompensation. 615 F.3d at 750. But the

claimant in *Larson* had "significant alternations in her medications" and a nervous breakdown that caused her to miss almost two weeks of work. *Id.*

The Plaintiff has not pointed to any evidence of a decompensation. Unlike *Larson*, none of the physicians here opined that the Plaintiff experienced episodes of decompensation. Here, the ALJ noted that two medical experts stated that the Plaintiff did not have any impairments or combination of impairments that met or medically equaled the severity of a listed section. (R. 1149.)

The Plaintiff also argues that her multiple GAF ratings of 45 show that she experienced episodes of decompensation. (Pl.'s Br. 18.) But the ALJ explicitly addressed these GAF ratings, noting that they only appeared to change when she had a new mental health provider, and did not change when treatment notes suggested improvement in her conditions. (R. 1152.) The ALJ also correctly noted that the GAF ratings are not controlling in disability determinations. (*Id.*); *see Denton v. Astrue*, 546 F.3d 419, 425 (7th Cir. 2010); *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("the GAF scale is intended to be used to make treatment decisions, and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.") Here, the ALJ made a thorough presentation of the Plaintiff's clinical findings and other evidence in the opinion, not solely relying on GAF scores.

Accordingly, upon review of the record, the Court finds that the ALJ properly found that the Plaintiff did not have an episode of decompensation.

## D.     Section 12.09

Section 12.09 does not have paragraph A, B, or C requirements. 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.09. Rather, it requires behavioral changes or physical changes associated

with the regular use of substances that affect the central nervous system. *Id.* The required level of severity for these disorders is met when the requirements in any of the following paragraphs are satisfied: (A) organic mental disorders, evaluated under 12.02; (B) depressive syndrome, evaluated under 12.04; (C) anxiety disorders, evaluated under 12.06; (D) personality disorders, evaluated under 12.08; (E) peripheral neuropathy, evaluated under 11.04; (F) liver damage, evaluated under 5.05; (G) gastritis, evaluated under 5.00; (H) pancreatitis, evaluated under 5.08; or (I) seizures, evaluated under 11.02. *Id.* In other words, the only way a claimant can meet listed section 12.09 is if he or she also meets the criteria in one of the preceding listed sections. *Id.* Because the Plaintiff did not meet any of the criteria in Sections 12.04 and 12.06, the Court also finds that the Plaintiff did not meet any of the criteria for section 12.09.

Accordingly, upon review of the record, the Court finds that the ALJ properly found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed section.

## II.    Plaintiff's RFC

The Plaintiff next argues that the ALJ should have included a limitation in her RFC assessment that the Plaintiff would not be able to complete a normal workday and workweek without interruptions from psychologically based symptoms and, thus, would not be able to maintain regular employment. (Pl.'s Br. 18–19). But the Plaintiff does not cite to objective medical evidence, medical opinion evidence, or any other evidence in the record to support her assertion that the Plaintiff should have had an RFC with this limitation. "Appellants . . . must present arguments supported by legal authority and citations to the record. A generalized assertion of error is not sufficient to challenge an adverse ruling, and underdeveloped or

unsupported contentions are waived." *Cadenhead v. Astrue*, 410 F. App'x 982, 994 (7th Cir. 2011) (citations omitted).

The Plaintiff additionally argues that the ALJ neglected to include limitations related to the Plaintiff's statements that she needed to "elevate her legs and take extra breaks due to [e]dema." (Pl.'s Br. 19.) The Court first notes that edema is not a physical impairment. But even assuming Plaintiff's argument as is, the ALJ may not accept the Plaintiff's statements without objective medical evidence, medical opinion evidence, or any further evidence supporting them. "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. § 404.1508; *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("Although a claimant can establish the severity of his symptoms by his testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record.").

Accordingly, upon review of the record, the Court finds that the ALJ properly assessed the appropriate regulatory factors when finding that the Plaintiff retained the RFC to perform a reduced range of sedentary work, and could perform jobs that existed in significant numbers in the national economy.

## III.    Closed Period of Disability

An impairment must render a claimant unable to perform substantial gainful activity for a twelve-month period to be disabling. 42 U.S.C. § 423(d)(1)(A). In the briefing, the Plaintiff asks how she could not be entitled to at least a period of disability based on her "lengthy and severe mental health history, especially in combination with other impairments." (Pl.'s Br. 20.) As the basis for her argument, the Plaintiff cites to a number of non-precedential and, ultimately, unpersuasive cases. (*Id.*)

For example, the Plaintiff cites to *Lovette v. Astrue*, No. 07-2029, 2008 WL 65207, at *3 (W.D. Ark. Jan. 4, 2008), a case in which the ALJ erred by not considering a closed period of disability. (*Id.*) In *Lovette*, the ALJ erred by ignoring the claimant's various surgical procedures over a seventeen-month period and the absences from work they could cause. 2008 WL 62507, at *3–5. *Lovette* is not applicable here because the Plaintiff has not shown that the ALJ ignored evidence during the relevant period.

The Plaintiff also cites to *Lang v. Secretary of Health and Human Services*, No. 88-1561, 1989 WL 40188 (6th Cir. Apr. 12, 1989), in which the court found that the ALJ erred because he did not consider a closed period of disability. In *Lang*, the claimant was shot and stated that two years later he could return to work. 1989 WL 40188, at *2. There, the court found that the ALJ erred by only focusing on the period after the claimant admitted he was physically able to return to work and did not consider a closed period of disability from the time of the gunshot wound to the time of his admitted improvement. *Id.* Here, unlike in *Lang*, the ALJ thoroughly considered the evidence throughout the relevant period, from May 1, 2002, to October 31, 2008. (R. 1144–62.)

The Plaintiff also relies on *Ash-Davis v. Commissioner of Social Security*, No. C-1-06-648, 2008 WL 1886022, at *3 (S.D. Ohio Apr. 28, 2008), as support for her argument. But in *Ash-Davis*, a case concerning Equal Access to Justice Act fees, the Ohio district court found "strong evidence suggesting at least a closed period of disability." For instance, the court recounted the claimant's myocardial infarction, multiple stent placements, cardiac bypass surgery, and severe hypertension. *Id.* Here, the Plaintiff has not attempted to show that her impairments were on the level as those mentioned in *Ash-Davis*.

The Plaintiff also contends that she was entitled to a period of disability from September 2002 through June 2004 because she was raped in September 2002 and told mental health care providers that she was more nervous and needed more education. (Pl.'s Br. 21–22; R. 110.) But the ALJ discussed the Plaintiff's statement to her doctor that she was experiencing ongoing nightmares and flashbacks after the incident, as well as also her improvement after starting medication. (R. 1151.) The ALJ noted that the Plaintiff remained mostly stable throughout 2005 with an appropriate mood and affect. (*Id.*)

The Plaintiff also argues that because her doctor noted a marked decrease in sleepwalking episodes in June 2004, there is an "inference" that her sleepwalking was significant before that time. (Pl.'s Br. 22.) The Plaintiff does not point to evidence of "significant sleepwalking" during that period or any explanation as to why significant sleepwalking would be disabling. Outside of the possible inference that the Plaintiff's sleepwalking was at one point significant and that she experienced nightmares before stabilizing with medication, the Plaintiff does not point to any other evidence that she was unable to perform work at any physical or mental level from September 2002 to June 2004.

Accordingly, upon review of the record, the Court finds the ALJ was correct in finding that the Plaintiff was not disabled from May 1, 2002, through October 31, 2008.

**IV. Vocational Expert Testimony**

Lastly, the Plaintiff argues that the ALJ erred by not asking the VE what methodology she used to testify about the number of jobs available or inquire about the VE's methodology to make sure her testimony had a rational basis and was not a "mere fabrication." (Pl. Br. 22.) The Plaintiff, however, was represented by an attorney at the hearing. The Plaintiff's counsel did not raise these issues at the hearing. (R. 1310–16.) "Raising a discrepancy only after the hearing . . .

24

is too late. An ALJ is not obliged to reopen the record." *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002); *see also McFadden v. Astrue*, 645 F. App'x 557, 560 (7th Cir. 2012) ("[A] claimant represented by counsel is presumed to have made her 'best case' before the ALJ.").

After the ALJ presented the VE with her hypothetical question and the VE responded with jobs and job numbers, the ALJ gave the Plaintiff's attorney an opportunity to question the VE. (R. 1313–16.) The Plaintiff's attorney asked questions, but he did not question the source of the VE's numbers, the validity of her testimony, or the methodology she used. (*Id.*); *cf. Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008) ("Unlike in *Donahue*. . . , Overman's counsel cross-examined the VE and elicited statements that seriously called into question the reliability of the VE's bottom-line conclusions.").

The Plaintiff relies on *Alaura v. Colvin*, 797 F. 3d. 503, 507–508 (7th Cir. 2015), and *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014). The Seventh Circuit in *Alaura* and *Browning* questioned the accuracy of the VE's methodology in concluding the number of jobs available in the market place that a claimant can perform.[7] *Alaura v. Colvin*, 797 F.3d 503, 507–08 (7th Cir. 2015) ("We have recently expressed concern with the source and validity of the statistics that

---

[7] In one recent case, Judge Posner, concurring in judgment, expanded upon the issue:

> I write separately only to focus attention on what seems to me a persistent, serious, and often ignored deficiency in opinions by the administrative law judges of the Social Security Administration denying social security disability benefits (or, what is similar, supplemental security income). The deficiency concerns testimony by vocational experts employed by the Administration concerning the number and types of jobs that an applicant deemed not to be totally disabled could perform, and the evaluation of that testimony by administrative law judges. This deficiency has recently been attracting critical attention.
>
> * * *
>
> In short, the vocational expert's testimony was worthless—and this apart from the apparent arbitrariness of his numerology. It is time the Social Security Disability Office cleaned up its act.

*Hill v. Colvin*, 807 F.3d 862, 870–72 (7th Cir. 2015) (Posner J., concurring).

vocational experts trot out in social security disability hearings.") (citing *Browning*, 766 F.3d

702, 708 (7th Cir. 2014)).

Since *Browning*, numerous district courts have noted that the *Browning* line of cases did

not overrule earlier Seventh Circuit precedent that an ALJ is entitled to accept a VE's testimony

regarding job numbers where a VE provides representative jobs and job numbers after being

presented with a claimant's limitations and "no one questions the vocational expert's foundation

or reasoning." *Donahue*, 279 F.3d at 446 ("When no one questions the vocational expert's

foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion. . . . If

the basis of the vocational expert's conclusions is questioned at the hearing, however, then the

ALJ should make an inquiry."); *see Willis v. Berryhill*, 3:16-CV-142-PPS-JEM, 2017 WL

3297778, at *4 (N.D. Ind. Aug. 1, 2017) ("While it is correct that the Seventh Circuit has

questioned the accuracy of job statistics from vocational experts, the Seventh Circuit has not

overruled its precedent holding that the ALJ is entitled to accept a vocational expert's testimony

where no one questions the vocational expert's foundation or reasoning.") (quotations and

citations omitted); *Chavez v. Berryhill*, 1:16-CV-314-WCL, 2017 WL 3124432, at *5 (N.D. Ind.

July 24, 2017) ("Without any holding reversing *Donahue*, Courts have refused to remand solely

for challenges to VE methodology, citing a lack of guidance from the Seventh Circuit.");

*Adamec v. Berryhill*, 15 C 11811, 2017 WL 1196920, *6 (N.D. Ill. March 31, 2017) ("[T]he

Seventh Circuit's repeated criticism of the use of the DOT in VE testimony, while pointed, was

merely dicta and does not merit remand."); *Hoffman v. Colvin*, Case No. 15-C-940, 2016 WL

5107063, at *6 (E.D. Wis. Sept. 20, 2016) ("Here, [p]laintiff was represented by counsel at the

hearing, and counsel declined to question the VE's data. That would have been the time to ask,

and so the issue is rightly deemed waived."); *Weir v. Colvin*, No. 15-cv-532, 2016 WL 4083524,

at *3 (W.D. Wis. Aug. 1, 2016) ("[plaintiff's] argument [about VE methodology] is well taken. But [plaintiff's] criticism of the VE's methodology is not a basis for remand until appellate precedent instructs that relying on the methodology is reversible error.").

The Court finds the Plaintiff's argument that there could be potential flaws with the VE methodology well taken. But without more guidance from the Seventh Circuit, this Court is bound by its precedent. Thus, if the Plaintiff's attorney had questions or doubts about the VE's methodology, he was free to raise those questions at the hearing. And if the Plaintiff's attorney was dissatisfied with the VE's responses, he had the opportunity to ask the ALJ not to credit the expert's testimony. Absent any challenge to the VE's foundation or reasoning at the hearing, the ALJ was entitled to rely on the VE's testimony, to the extent that the ALJ satisfied her affirmative obligation to resolve any conflicts in occupational information.

But the ALJ, in fact, did not satisfy her affirmative duties here. The *Donahue* court noted in dicta that a VE still has an affirmative duty to resolve conflicts in occupational information, which was later confirmed in *Prochaska v. Barnhart*, 454 F.3d 731, 735–36 (7th Cir. 2006). "SSR 00-4p requires an ALJ who takes testimony from a vocation expert about the requirements of a particular job to determine whether that testimony is consistent with the Dictionary of Occupational Titles." *Id.*; *see* 20 C.F.R. § 416.966(d)(1). "When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an *affirmative responsibility* to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." *Id.* (quoting SSR 00-4p) (emphasis in original). Absent this affirmative duty, the VE's testimony is not based in "substantial evidence supporting the outcome of the hearing." *Id* at 738.

On review of the record, the Court finds that the ALJ did not sufficiently ask the VE questions concerning whether the VE's conclusions conflicted with DOT. The extent of the exchange between the ALJ and the VE is as follows:

Q:      And, we established at the last hearing with, I believe a different VE that the claimant has no skills transferrable to sedentary so we are, just, and besides, the time period we're talking about she was less than 50 years old so if I were to find that an individual of the claimant's age, education and the past work experience as you described it who's limited to sedentary work, no ladders, ropes or scaffolds, only occasional balancing, stooping, kneeling, crouching and crawling, of course, no more than 10 pounds lifting and that when walking the individual uses a cane in one hand. Now it's my understanding that the prohibition on ladders, ropes and scaffolds and the occasional postural activities of crawling and those other things that don't actually implicate the sedentary occupational base. Is that correct?

A:      Correct.

Q:      And, because of the size and weight of the objects if something needs to be carried from one place to another the fact that there's a cane in one hand doesn't affect the sedentary occupational base. Is that correct?

A:      Correct, as long as the person can still carry those items of negligible weight with the free hand.

Q:      And I'm going to add for the mental limitations no work around the general public, brief and superficial with co-workers and supervisors, simple routine tasks relatively unchanging setting and process, oh, and I did mean to add no concentrated pulmonary irritants for the physical. No more concrete judgment, no fast pace. With those limitations is there work such an individual can perform?

A:      Yes, considering these limitations at the sedentary level all with an SVP of 2 the job of an addresser could be performed. I would estimate around 200 jobs in the state and 34,000 nationally. The DOT is 209.587-010. The job of a surveillance system monitor would accommodate the limitations. I would estimate around 200 jobs in the state and 15,500 nationally. The DOT is 2379.367-010. This is listed as a government service in the DOT but is representative of monitors elsewhere and a job of a document preparer would accommodate the limitations. I would estimate around 16,000 in the state and 790,000 nationally. The DOT code is 249.587-018.

Q:      And that last job the DOT talks about microfilm and that sort of thing is the job done differently now?

A:   Microfilming is all but extent (sic). It's been replaced by more modern technology but the essential tasks of the job still remain the same.

Q:   So it still has the same skill level and basic - -

A:   Yes.

Q:   - - work tasks, it's just different machines that do the - -

A:   Yes.

Q:   - - that they work with, okay, what is the tolerance for time off task or breaks beyond the two 15 minutes per day and half hour lunch described in the rulings.

A:   Outside of that regular break schedule usually the most a worker could be off task is about 10 percent of a work day.

Q:   But not all at one time?

A:   Not all at one time?

Q:   That's the question. It needs to be scattered through the work day - -

A:   Correct.

Q:   And what is the tolerance for absence in competitive employment?

A:   Usually if a worker is having two to three unexcused absences per month four consecutive months in a row or if they're having more than 12 in a year there would be no full time competitive work.

(R. 1310–13.) According to the Social Security Regulations and Rulings, the ALJ should have affirmatively asked the VE whether there was any possible conflict with her conclusions and DOT. The ALJ's question about whether the job of document preparer had an outdated definition because its description included using microfilm was not enough. *Prochaska*, 454 F.3d at 735 ("The ALJ here took testimony from an expert as to whether certain job requirements were compatible with [the plaintiff's] various limitations, but did not ask whether the expert's analysis conflicted with the DOT.").

Accordingly, the Court remands this case back to the ALJ to satisfy her affirmative obligation under SSR 00-4p to inquire about all conflicts in occupational information "at the hearing level, as part of [the ALJ's] duty to fully develop the record" and "inquire, on the record, as to whether or not there is such consistency." SSR 00-4p. If the Plaintiff has an issue with the VE's methodology, the Plaintiff may probe the issue at the hearing as well.

## CONCLUSION

For the reasons stated above, the Court REVERSES the Commissioner's decision and REMANDS the decision to the ALJ for further proceedings consistent with this Opinion.

SO ORDERED on September 5, 2017

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT